**SATELLITE BROADCASTING & COMMUNICATIONS ASSOCIATION OF AMERICA, et al., Plaintiffs,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, et al., Defendants,**

and

**National Association of Broadcasters, et al., Defendant–Intervenors.**

**No. CIV.A 00–1571–A.**

United States District Court, E.D. Virginia, Alexandria Division.

June 19, 2001.

Robert J. Cynkar, Cooper, Carvin & Rosenthal, Washington, DC, for Satellite Broadcasting & Communications Assn. of America, Echostar Communications Corp., DIRECTV Enterprises, Inc. and DIRECTV Operations, Inc.

Susan Rebbeca Podolsky, Jenner & Block, Washington, DC, for National Assn. of Broadcasters, Assn. of Local Television Stations, Inc., Universal Network Ltd. Partnership and Univision Television Stations, Inc.

Richard Parker, U.S. Attorney's Office, Alexandria, VA, for defendants.

Thomas H. Yancey, Sidley & Austin, Washington, DC, for Pegasus Communications Corp.

Michael Joseph McManus, Brian Arthur Coleman, Drinker, Biddle & Reath, Washington, DC, for Channel Master LLC.

Eleanor Carrie Nixon, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Washington, DC, for National Cable Satellite Corp.

April Renee Callahan, Willkie, Farr & Gallagher, Washington, DC, for Space Systems/Loral, Inc.

Craig Crandall Reilly, Richards, McGettigan, Reilly & West P.C., Alexandria, VA, for Paxson Communications Corp.

George Luther Washington, Jr., Covington & Burling, Washington, DC, for Assn. of America's Public Television Stations, Public Broadcasting Service, and Corp. for Public Broadcasting.

Anthony William Show, Brobeck, Phlefer & Harrison, LLP, Washington, DC, for Conexant Systems, Inc.

Liam O'Grady, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC, for Broadcom Corp.

## *MEMORANDUM OPINION*

LEE, District Judge.

This case involves satellite carriers' facial challenge to the constitutionality of the copyright license created by the Satellite Home Viewer Improvement Act of 1999 and the license's "must carry" provisions under the First and Fifth Amendments to the Constitution. In essence, the satellite carriers assert that the "must carry" provisions of the new copyright license infringe upon carriers' First Amendment right to control program content and effect a "taking" of property in violation of the Fifth Amendment because the carriers are required to carry certain stations in a given market if the carriers want to take advantage of the copyright license in that market.

The specific issues before the Court are whether Plaintiffs have pled a cause of action that (1) the Satellite Home Viewer Improvement Act of 1999 ("SHVIA" or "Act"), on its face, violates satellite carriers' First Amendment rights; (2) Congress has exceeded its authority in promulgating SHVIA; (3) SHVIA effects a taking of satellite carriers' private property without just compensation in violation of the Fifth Amendment Takings Clause; and (4) SHVIA deprives satellite carriers of their property without due process in violation of the Fifth Amendment Due Process Clause.

The problem that led Congress to pass SHVIA was that, for the most part, satellite carriers did not transmit local television stations as a part of their basic satellite packages unless they secured permission from broadcasters or secured copyright licenses to retransmit the works of copyright holders. In practical terms, a satellite home subscriber could use their satellite dish to receive premium programs like Home Box Office ("HBO") programs, but the home viewer could not use their satellite dish to receive local news, and local independent and public programming. Home viewers were required to switch their televisions to local stations via antenna or cable television. This dual technology problem created an undesirable limitation on the home viewer's access to local television programs. This situation also created pressure on the home viewer to opt against satellite television, and to select cable television options, or to ignore the advances in technology and rely upon traditional broadcast free television.

As the spectrum of satellite programs expanded nationally, the limit on access to local news and programming inhibited the wide flow of information to television home viewers. Congress enacted SHVIA in response to the growing concern about the future of free television and the promotion of competition, and in recognition that the Copyright Act might have been impeding development of the satellite broadcast medium and local programming.

The satellite carrier plaintiffs welcome the grant of a copyright license to retransmit the copyrighted works of others without having to pay royalties, but they object to the Act's requirement that, as a condition to carrying a single station in a geographic market area royalty-free, the satellite carriers "must carry" (i.e., retransmit) all local television stations in that geographic area upon request of the local station. Plaintiffs assert that the must-carry provisions are unconstitutional. The satellite carrier plaintiffs' constitutional objections, while substantial, are not well taken.

The Court holds that the Satellite Home Viewer Improvement Act of 1999 is constitutional and does not in any way violate the First and Fifth Amendment rights of satellite carriers. Moreover, the Act is a proper exercise of Congress' plenary powers over copyright and Congress' power to promote the free and full exchange of information over the broadcast spectrum. In considering the satellite carriers' First Amendment claims, the Court holds first that SHVIA is subject to review using intermediate scrutiny. Next, the Court finds that the must-carry provisions do not violate Plaintiffs' First Amendment rights because (1) neither the provisions' language nor their purpose are content-based; (2) the provisions are within the authority granted to the Government under the Copyright Clause; (3) the must-carry provisions further important governmental interests that are unrelated to the suppression of free expression; and (4) any incidental restriction on satellite carriers' First Amendment freedoms is no greater than necessary to further the Government's interests. With respect to the satellite carriers' Fifth Amendment claims, the Court holds that SHVIA does not effect a taking of satellite carriers' property because the carriers may choose to accept or decline a free copyright license to retransmit the local programs of any given market. Satellite carriers decide whether to incur the must-carry obligations because the obligations travel with the optional copyright license into various markets. Moreover, SHVIA's copyright license has the potential to expand the value of satellite carriers' property. Finally, the Court holds that the must-carry regulations do not violate due process because Congress has acted within its authority in promulgating the must-carry provisions, and the regulations do not strip satellite carriers' property of all of its value.

For these reasons, the Court does not sustain the satellite carriers' constitutional objections to SHVIA. Therefore, the Court grants Defendants' motions to dismiss for the reasons detailed below.

## I. BACKGROUND

Plaintiff Satellite Broadcasting and Communications Association of America ("SBCA") is a nonprofit national trade association that represents all segments of the satellite industry. SBCA represents the interests of its members in protecting and expanding the use of satellite technology. Plaintiffs DIRECTV Enterprises, Inc., DIRECTV Operations, Inc., DIRECTV, Inc. (collectively "DIRECTV"), and Plaintiffs Echostar Communications Corporation ("ECC") and ECC's wholly-owned subsidiary Dish Ltd., d/b/a "The Dish Network" (collectively "Echostar") are competing satellite carriers that provide satellite television service to subscribers over direct broadcasting satellite ("DBS") systems. Satellite carriers are unlike cable system operators. Because satellites are a national medium, satellite carriers do not compete with local stations for local advertising revenues. Also, unlike most cable operators, satellite carriers do not enjoy a monopoly over service in

their service territory. Satellite carriers compete with each other and with cable systems nationwide.

In 1999, Congress enacted the Satellite Home Viewer Improvement Act of 1999. Prior to enactment of the Act, direct-to-home satellite carriers such as Plaintiffs could not, with limited exceptions, include local television stations in the programming packages they offered subscribers. Congress had amended the Copyright Act in 1976 to grant owners of copyrights in audiovisual work, such as television programs, the exclusive right to perform or display the copyrighted work publicly, or to authorize a public display of the work. *See* 17 U.S.C. §§ 106(4), (5). Therefore, satellite carriers focused on broadcasting specialized premium channels and not local television stations' programming because retransmitting local programming required carriers to obtain copyright licenses. SHVIA created a new statutory copyright license, permitting, but not requiring, satellite carriers to engage in satellite retransmission of a local television station signal into the station's own designated market area ("DMA") without the need to identify and obtain authorization from copyright owners to retransmit the owners' programs. *See* 17 U.S.C. § 122.

The SHVIA license is similar to the cable systems operators' license created in the Cable Television Consumer Protection and Competition Act of 1992, 47 U.S.C. §§ 534, 535 (1992). In passing SHVIA, Congress sought to enable satellite carriers to compete more effectively with cable television operators in the marketplace by granting carriers a statutory copyright license similar to the license that had long been afforded cable operators. At the same time, Congress placed a "shall carry" (i.e., "must-carry") requirement on any satellite carrier employing the satellite copyright license.

Specifically, 47 U.S.C. § 338(a) requires a satellite carrier that chooses to carry one local broadcast television station to carry *every* local broadcast station within that market (DMA) *upon request.* The requirement is analogous to the requirement accompanying cable operators' statutory license that the operators carry local broadcast television stations within the operators' local markets. However, the must-carry requirements associated with the satellite carriers' license to transmit local television stations was drafted with modifications in recognition of the practical differences between the cable industry and the satellite industry. SHVIA's carriage obligations, unlike cable's corresponding "must-carry" requirement, apply only on a market-by-market basis; thus, unlike cable must-carry requirements, SHVIA allows satellite carriers to choose whether to incur must-carry obligations in a particular market in exchange for the benefits of the statutory license. In addition, carriers have no obligation to carry more than one local station in a market affiliated with a particular network. Furthermore, carriers may elect not to take advantage of the license created by SHVIA and, instead, may contract with stations or copyright owners individually in order to narrow the selection of local stations a carrier transmits. Also, SHVIA does not impose the same channel-positioning restrictions imposed on cable operators.

The satellite carriers' must-carry requirement takes effect on January 1, 2002. Plaintiffs have filed a Complaint seeking declaratory judgment that the must-carry provisions of § 338 are beyond Congress' constitutional authority under the Copyright Clause, violate the Speech and Press Clauses of the First Amendment, and violate the Takings and Due Process Clauses of the Fifth Amendment. Plaintiffs also seek to enjoin several federal defendants

from promulgating any rules or regulations or taking any other steps to enforce the allegedly unconstitutional aspects of § 338. The federal defendants that Plaintiffs seek to enjoin are the Federal Communications Commission ("FCC"), the FCC's Chairman (William E. Kennard), the FCC's Commissioners (Susan Ness, Harold Furchtgott–Roth, Michael K. Powell, and Gloria Tristani), the United States Copyright Office of the Library of Congress, the Librarian of the Library of Congress (James H. Billington), and the Registrar of Copyrights (Marybeth Peters).[1] The Court has granted the request of several organizations to intervene as defendants.[2] Defendants move to dismiss Plaintiffs' Complaint.

## II. PARTIES' CONTENTIONS

### A. *Federal and Intervenor Defendants*

As an initial matter, Defendants assert that Plaintiffs' as-applied claims are not ripe for judicial review. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). They assert that the Court should not rule on Plaintiffs' claims at this time because the issues are "likely to stand on much surer footing" at a later date. *See Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967). To determine ripeness, the Court should examine (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration. *See Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. 1507; *Arch Mineral Corp. v. Babbitt*, 104 F.3d 660, 665 (4th Cir.1997). Defendants assert that, for each Plaintiff, the

claims hinge on contingent events, acts of third parties not before the Court, and unpredictable future developments in satellite technology that may or may not occur before January 1, 2002; therefore, Defendants argue, the claims are not ripe. *See Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (stating that a claim is not ripe when it rests on contingent events that may not occur when anticipated, if at all); *Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. 1507 (stating that a claim is not fit for review if the dispute is not a purely legal one, but one on which the court could benefit from further factual development); *Arch Mineral*, 104 F.3d at 665 (same). Just one example of a future event upon which Plaintiffs' claims are contingent is the fact that the § 338 must-carry provisions are triggered only if Plaintiffs choose to retransmit local stations within a given market, and only if Plaintiffs choose to rely on the § 122 license. Also, as noted by Plaintiffs, satellite technology may change over the coming year. (Compl.¶¶ 6, 33.) Defendants assert that Plaintiffs' statements about how many channels it will be required to carry, what their channel capacity is, and what their carriage obligations will be are all contingent on present technology. (*Id.* ¶¶ 6, 26, 26, 31–33.)

Furthermore, Defendants argue, the hardship prong of the ripeness test disfavors a ruling on Plaintiffs' claims at this time. Defendants contend that because the carriage obligations do not become effective until January 1, 2002, Plaintiffs will not suffer any "immediate, direct, and significant" hardship if the Court withholds consideration of their claims. *See West*

---

**1.** The individuals that Plaintiffs seek to enjoin Plaintiffs sue in their official capacities.

**2.** The parties that have intervened as defendants are the National Association of Broadcasters, Association of Local Television Stations, Inc., Univision Network Limited Partnership, Univision Television Group, Association of America's Public Television Stations, Public Broadcasting Service, and Corporation for Public Broadcasting.

*Virginia Highlands Conservancy, Inc. v. Babbitt,* 161 F.3d 797, 801 (4th Cir.1998) (stating that a court must decide whether postponing review will cause "immediate, direct, and significant" harm to plaintiffs); *Kemler v. Poston,* 108 F.Supp.2d 529, 542 (E.D.Va.2000) (holding that courts should determine whether the harm of deferring review outweighs the benefits deferment will bring the court).

As to the merits of Plaintiffs' claims, Defendants argue that SHVIA is within the scope of Congress' power under Article I of the Constitution. Defendants assert that Congress has broad authority under the Copyright Clause to define the scope of the rights of copyright holders. *See Sony Corp. of America v. Universal City Studios,* 464 U.S. 417, 429–32, 456, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Defendants contend that, because Congress is entrusted with deciding which specific category of "Writings" should be brought within the purview of the statutory scheme, Congress has the power to use copyright, or exceptions thereto, to promote particular types of work, or works by particular authors, in preference to other types of works or authors. *See Goldstein v. California,* 412 U.S. 546, 562, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973). Congress also has the authority to determine the degree of copyright protection in light of advancing technology. *See Sony,* 464 U.S. at 431, 104 S.Ct. 774. Defendants assert, in short, that Congress has acted properly within its obligations of balancing the competing considerations of copyright, communications, antitrust policy, and the economy. *See Fortnightly Corp. v. United Artists Television,* 392 U.S. 390, 401, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968); *Goldstein,* 412 U.S. at 562, 93 S.Ct. 2303 (stating that Congress can consider the commercial importance of a product on the economy). The Supreme Court has already noted that Congress acted within its power regarding the analogous "must-carry" provisions in the cable industry. *See Capital Cities Cable v. Crisp,* 467 U.S. 691, 710, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984) (referencing the Copyright Revision Act of 1976, which introduced cable's must-carry provisions).

Defendants also argue that Congress acted within its powers under the Commerce Clause in regulating satellite transmissions of television broadcasts in a way that promotes competition. *See United States v. Lopez,* 514 U.S. 549, 558, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (stating that Congress may regulate channels of interstate commerce, instrumentalities of that commerce, and activities that substantially affect that commerce). Defendants assert that the "channels of interstate commerce" that Congress has authority to regulate include television and radio broadcast frequencies, *see Gibbs v. Babbitt,* 214 F.3d 483, 490–91 (4th Cir.2000), and satellite communication frequencies, *see United States v. Miles,* 122 F.3d 235, 245 (5th Cir.1997). Under the Commerce Clause, Congress can regulate broadcast communication. *See FCC v. League of Women Voters,* 468 U.S. 364, 376, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984).

Defendants also assert that SHVIA complies with the requirements of the First Amendment. Defendants emphasize that SHVIA *permits* satellite carriers to retransmit local broadcast television programming. The carriers have the choice to accept or to decline to accept the benefits of the license created by SHVIA. Thus, Defendants argue that there is no state interference with a protected activity here, only the encouragement of an alternative activity consonant with legislative policy (i.e., carrying local television stations). *See National Endowment for the Arts v. Finley,* 524 U.S. 569, 588, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (drawing a

distinction between the two). Defendants contend that SHVIA actually *expands* Plaintiffs' options by permitting them to retransmit broadcasts without being subject to copyright restrictions. *See* 17 U.S.C. §§ 122(a), (c). Plaintiffs have the choice of whether to invoke the license created by SHVIA; therefore, the local carriage obligations are not "coercive." *See Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 550, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (indicating that Congress does not exceed its powers by encouraging actions deemed to be in the public interest); *Rust v. Sullivan*, 500 U.S. 173, 199 n. 5, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (stating that the government does not violate the First Amendment by offering certain choices). Defendants contend that if Plaintiffs choose not to invoke the SHVIA license, Plaintiffs can still carry programming for which they can obtain property rights. Defendants assert that if Plaintiffs are unable to obtain rights to some broadcasts, it is the necessary consequence of the copyright laws and does not violate the First Amendment. *See Harper & Row, Publishers v. Nation Enters.*, 471 U.S. 539, 555–60, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *United Video v. FCC*, 890 F.2d 1173, 1191 (D.C.Cir.1989) (stating that there is no First Amendment right to make commercial use of the works of others).

Defendants also argue that, even if SHVIA does burden Plaintiffs' speech under the First Amendment, SHVIA does not violate the First Amendment because it contains content-neutral provisions that are narrowly tailored to further the substantial government interests of promoting parity between the cable and satellite industries for purposes of competition, making diverse voices available to viewers, and protecting consumers against rate increases. Defendants argue that SHVIA must-carry provisions are content-neutral, like the cable "must-carry" rules at issue in *Turner Broad. Sys. v. FCC (Turner I)*, 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Defendants assert that the provisions by their terms do not favor or disfavor speech based on the ideas or views expressed in the speech. *See id.* at 642–43, 114 S.Ct. 2445. Defendants assert that the applicability of SHVIA's carriage provisions is not triggered by viewpoint, but turns only on whether Plaintiffs choose to retransmit television broadcasts within a particular geographic market, and whether Plaintiffs independently secure the rights to broadcast copyrighted works or choose to invoke the SHVIA license to do so. Defendants argue that, furthermore, the purposes, design, and operation of SHVIA are content-neutral. *See Turner I*, 512 U.S. at 647, 649, 114 S.Ct. 2445 (indicating that must-carry provisions did not violate First Amendment where they did not require or prohibit carriage of particular ideas or points of view, did not penalize cable providers because of the content of their programming, did not compel the affirmation of certain views, did not produce a net decrease in the amount of speech, and still permitted providers to carry whatever programming they wished on channels not subject to the must-carry rules).

Defendants contend that, due to their neutral content and intent, as with the cable "must-carry" rules, the satellite must-carry provisions should be upheld because they advance an important governmental interest and do not burden substantially more speech than necessary. *See Turner Broad. Sys. v. FCC (Turner II)*, 520 U.S. 180, 189, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997). Defendants urge that, in fact, regulations of satellite transmissions are subject to "a less rigorous standard of First Amendment scrutiny" than those of the cable industry. *See Turner I*,

512 U.S. at 637–38, 114 S.Ct. 2445; *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 389–90, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

Defendants also argue that SHVIA does not effect a taking of Plaintiffs' property without just compensation. Defendants assert that the Act does not effect a *per se* taking because there is no permanent physical occupation of Plaintiffs' property that deprives Plaintiffs of the rights to possess, use, and dispose of their property. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435–36, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). Defendants assert that the statute permits Plaintiffs to do everything with their property now that they could do before the Act was passed, as long as Plaintiffs obtain permission from copyright owners. Defendants contend that SHVIA actually gives Plaintiffs more rights than they had before the Act was passed, because Plaintiffs can voluntarily enter into a situation where they need not obtain copyright owners' permission. Defendants also argue that there is no regulatory taking effected by SHVIA because Plaintiffs are not denied "all economically viable use" of their property. *See Agins v. City of Tiburon*, 447 U.S. 255, 260–61, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). Plaintiffs may use their property as they see fit. As noted, SHVIA actually eliminates a class of burdens on what Plaintiffs may do with their property, thereby enhancing, not diminishing, the value of the property.

Finally, Defendants assert that SHVIA does not violate the due process requirements of the Fifth Amendment. There are three elements to a cognizable substantive due process claim involving property: (1) "the claimant must establish possession of a property interest," (2) "state action must deprive the claimant of the property interest," and (3) "the state's action must fall 'so far beyond the outer limits of legitimate government action that no process could cure the deficiency.'" *Front Royal and Warren County Indus. Park Corp. v. Town of Front Royal, Va.*, 135 F.3d 275, 288 (4th Cir.1998). Although Plaintiffs do have a property interest in their real property, facilities, satellites, and spectrum capacity, for the reasons stated above in Defendants' takings discussion, Defendants contend that SHVIA does not deprive Plaintiffs of any interest in their property, real or personal, but actually expands, on a voluntary basis, what Plaintiffs can do with their property. Also, Defendants argue that the third due process element is not met, because, as explained above, Congress has acted within its regulatory power to achieve legitimate ends. *See* H.R. Rep. No. 106–464, at 90–95, 101 (stating that the purpose of SHVIA is to promote competition in the multichannel video programming marketplace in a manner consistent with the strong public interest in providing viewers with information from a variety of sources); *Turner I*, 512 U.S. at 664, 114 S.Ct. 2445 (recognizing that both of these objectives are substantial government interests within the limits of government action).

### B. *Plaintiffs*

As an initial matter, Plaintiffs argue that their facial challenge to the constitutionality of SHVIA is ripe for judicial resolution. Plaintiffs emphasize that, contrary to Defendants' assertion, Plaintiffs do not bring an "as-applied" challenge to the must-carry provisions of SHVIA; they bring a facial challenge to the statute. Plaintiffs argue that 47 U.S.C. § 338(a) includes a speech- and speaker-based restriction that burdens and chills the exercise of Plaintiffs' editorial discretion, irrespective of the technological limits on Plaintiffs' channel capacity. Plaintiffs contend that this "purely legal" issue is fit for judicial review. *See Thomas v. Union Carbide*

*Agric. Prods.*, 473 U.S. 568, 581, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (finding that where issue presented was purely legal, case was ripe). Furthermore, Plaintiffs contend that the harm to Plaintiffs will eventually materialize because as long as a single local station opts for the must-carry under SHVIA, Plaintiffs will suffer *some* harm to their editorial discretion. Also, Plaintiffs contend that they currently suffer harm because their decisions concerning what programming to carry now as well as in 2002 are effected by the anticipated effects of must-carry.

In opposition to Defendants' substantive arguments, Plaintiffs assert that satellite carriers exercise editorial discretion in their selection of programs. Plaintiffs argue that carriers create their own speech, such as on-air programming guides, to inform consumers of available programming. Plaintiffs assert that satellite carriers do not have unlimited channel capacity to carry all of the video programming, music programming, and other programming currently available. Therefore, Plaintiffs argue, SHVIA's must-carry requirement necessarily limits which programming satellite carriers can provide, and where, thus infringing on carriers' editorial discretion. The channel capacity consumed by local stations already prevents satellite carriers from carrying any local stations in numerous mid-sized and smaller local markets.

Plaintiffs assert that even if satellite carriers did have unlimited capacity, they would nonetheless exercise discretion in selecting which local stations to include, based on popularity of programming among consumers, the carrier's programming goals, whether the local stations are duplicative of national and regional programming already offered, and other considerations.[3] Plaintiff argues that the must-carry provisions impose the onerous burden of compelling Plaintiff to display numerous unwanted copyrighted works contrary to Plaintiffs' will.

Essentially, Plaintiffs argue that, under *Miami Herald Publishing Co. v. Tornillo,* the Government cannot require Plaintiffs to carry speakers unwanted by Plaintiffs but favored by the Government (e.g., independent broadcasters) as the price for carrying other desired speakers (e.g., network affiliated broadcasters). 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). Plaintiffs argue that Defendants seek to defend the must-carry requirement by resurrecting the "rights-privilege" distinction, which allows the Government to condition a "privilege" on a citizen's waiver of a constitutional right. According to Plaintiffs, Defendants characterize the lifting of the copyright restrictions on retransmitting copyrighted broadcast programming as a privilege; therefore, being able to use editorial discretion in the absence of the copyright restrictions is also a privilege. Plaintiffs assert that the Government cannot require Plaintiffs to broadcast unwanted speakers simply because the Government believes that inclusion of unwanted speakers furthers the public interest. Plaintiffs submit that the Government cannot condition a copyright license upon the requirement that satellite carriers retransmit the generally favored speech of various local television stations. Plaintiffs argue that such a requirement is analogous to the Government passing a law requiring newspaper editors to seek out and grant space for contrary points of view within their newspapers. *See generally Miami Herald,* 418 U.S. 241, 94 S.Ct. 2831. The Supreme Court in *Miami Herald* held that

---

3. Arguably, the carrier's decisions could reflect the image the carrier wants to project, etc. (e.g., a more family-oriented carrier in some markets, or a more "hip" carrier in others).

it was impermissible for the Government to require a newspaper that printed one person's editorial point of view to require the newspaper to give equal space (i.e., grant a "right to reply") to a person of the opposing view. *See id.* at 258, 94 S.Ct. 2831. Plaintiffs contend further that just as it would be improper for the Government to condition a newspaper's antitrust immunity or "shield law" protection of confidential sources upon the newspaper's voluntary adoption of the unconstitutional "right to reply" regime, it is unconstitutional for Congress to condition a satellite carriers' copyright license to retransmit copyrighted works upon the carriers' voluntary adoption of a "must-carry" regime.

Plaintiffs further assert that the § 122 copyright license cannot be justified as a government subsidy to the carriers. When Congress exercises its spending power, it may refrain from supporting certain speech or constitutionally-protected activity. *See Rust,* 500 U.S. at 197, 111 S.Ct. 1759 (stating that Congress does not penalize abortion by refraining from underwriting it through direct cash payment or tax subsidies); *Regan,* 461 U.S. at 546, 548–49, 103 S.Ct. 1997 (indicating that Congress does not penalize lobbying by refraining from giving direct cash payments or tax subsidies); *Harris v. McRae,* 448 U.S. 297, 316–17, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (stating that a refusal to fund protected activity, without more, cannot be equated with a penalty on that activity). Plaintiffs assert that the § 122 copyright license is not a subsidy because the Government is not exercising its "spending" powers; only regulatory powers are implicated in the § 122 license and the § 338 must-carry provision. Plaintiffs argue that there is no rule that a government can use its regulatory powers to influence or penalize speech, or as leverage to influence a private actor's own speech. *See First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 778 n. 14, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (White, J., dissenting) (opining that suspension of government regulation-in other words, granting of a license-is not analogous to a financial subsidy); *Pacific Gas & Elec. Co. v. Public Utils. Comm'n of Cal.,* 475 U.S. 1, 6 n. 4, 17 n. 14, 15, 18, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (holding that status as a regulated company did not reduce a company's right to be free from state regulation that burdens speech); *League of Women Voters,* 468 U.S. at 378–80, 383–84, 104 S.Ct. 3106; *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) (stating that the government may deny a benefit but may not do so on a basis that infringes on someone's constitutionally protected interests). Plaintiffs argue that the cases make clear that the receipt of a valuable, discretionary Government license or permit does not in turn authorize the Government to infringe on the recipient's First Amendment rights. *See, e.g., Chesapeake & Potomac Tel. Co. v. United States,* 42 F.3d 181, 185, 192 (4th Cir.1994). Therefore, Defendants' argument that the § 122 license to carry copyrighted works is a subsidy that need not be freely given under all circumstances must fail. "Government regulation may not favor one speaker over another." *Rosenberger v. Rector,* 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

Plaintiffs contend further that the § 122 license is not a subsidy because it is not a benefit granted by the Government, but by copyright holders. Plaintiffs assert that Government funds, property, exemptions, or jobs are not provided. Instead, § 122 manipulates one private party to support another. In addition, Plaintiffs argue that the § 122 license is not a subsidy because it is not really a benefit at all. The permission to retransmit copyrighted works is

really the removal of an obstacle of the Government's own creation.

Plaintiffs also argue that the Court should strictly scrutinize SHVIA's must-carry requirement because a satellite carrier exercises First Amendment discretion in making its channel selections. Plaintiffs assert that they can be analogized to cable operators, whom the Supreme Court has held are entitled to the freedom of speech and press provisions of the First Amendment for performing the same activities and exercising the same discretion as do satellite carriers. *See Turner I,* 512 U.S. at 636, 114 S.Ct. 2445 (citations omitted); *Leathers v. Medlock,* 499 U.S. 439, 444, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991). Plaintiffs contend that the must-carry requirements must be given First Amendment scrutiny because they regulate the satellite carrier's protected First Amendment rights. *See Turner I,* 512 U.S. at 637, 643–44, 114 S.Ct. 2445. Although the Cable Act's must-carry requirement was not subject to strict scrutiny, Plaintiffs argue that the differences between the statutes compel strict scrutiny of SHVIA. Plaintiffs note that the Supreme Court deemed the Cable Act's must-carry provisions to be content-neutral. *See Turner I,* 512 U.S. at 644, 647, 114 S.Ct. 2445. Therefore, the Court reviewed the must-carry provisions under intermediate scrutiny. *See id.* at 662, 114 S.Ct. 2445; *U.S. v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (setting forth intermediate scrutiny standard). Plaintiffs argue that, in contrast, SHVIA's must-carry requirement is not content-neutral; it is directly conditioned on whether the satellite carrier provides a certain form of identified speech (a local station) or not. A carrier is penalized by reason of the programs or stations it selects. *See Turner 1,* 512 U.S. at 644, 114 S.Ct. 2445. Plaintiffs contend that the fact that the carrier's burden to conform is triggered by the speaker (i.e., the chosen station) rather than what is said does not change the fact that the Act "penalize[s] the [satellite carrier's] own expression," in violation of the First Amendment. *See Pacific Gas & Elec.,* 475 U.S. at 9–10, 106 S.Ct. 903; *Turner I,* 512 U.S. at 659, 114 S.Ct. 2445 (noting that distinctions among different speakers within a single medium presents First Amendment concerns); *Miami Herald,* 418 U.S. at 256, 94 S.Ct. 2831 (evaluating under strict scrutiny a "right-to-reply" statute that forced a newspaper to take up space that could be devoted to other material the paper may have preferred to offer).

Finally, Plaintiffs contend that an additional basis for evaluating SHVIA under strict scrutiny is the fact that the Act serves no rational purpose.

## III. DISCUSSION

### A. *Ripeness*

■■■ Plaintiffs' claims are ripe for review. Defendants argue that Plaintiffs' "as-applied" claims are not ripe for judicial review. However, Plaintiffs do not bring an as-applied challenge to the must-carry provisions of SHVIA; they bring a facial challenge. (Pl. Opp'n to Mot. to Dismiss at 3.) Plaintiffs argue that the must-carry provisions are speech-triggered in structure, and, as such, they are speech- and speaker-based restrictions · on Plaintiffs' freedom of expression. The Court finds that the issue of SHVIA's facial constitutionality is ripe for judicial review because it will not be clarified by further factual development. *See Thomas v. Union Carbide,* 473 U.S. at 581, 105 S.Ct. 3325 (holding that purely legal issues are ripe for review). Plaintiffs "do[ ] not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough."

*Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 67 L.Ed. 1117 (1923), *quoted in Thomas,* 473 U.S. at 581, 105 S.Ct. 3325. SHVIA's must-carry provisions become effective January 1, 2002. The potential injury that Plaintiffs allege is sufficiently close in time to warrant the Court's consideration of the must-carry provisions' constitutionality. Plaintiffs are making decisions now about current and post-January 1, 2002 programming and channels that implicate the anticipated SHVIA copyright license.

## B. *Standard of Review*

■ A Court reviewing a motion to dismiss a complaint brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure accepts the complaint's factual allegations as true and views the allegations in a light most favorable to the non-moving party. *See Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993). The Court must grant a motion to dismiss for failure to state a claim if it appears to a certainty that the plaintiff cannot prove any set of facts in support of its claim which would entitle the plaintiff to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Here, Plaintiffs have made a facial challenge to a Congressional statute, alleging that the statute is unconstitutional. Accordingly, to survive a 12(b)(6) motion to dismiss, Plaintiffs must allege that the statute is unconstitutional in its language or its purpose. Plaintiffs' factual allegations must be supported by the statute in order for them to demonstrate that they will be able to prove at trial a set of facts in support of their claim which would entitle them to relief. *Cf. Conley,* 355 U.S. at 45–46, 78 S.Ct. 99 (stating that a court must grant a motion to dismiss where the plaintiff cannot prove a set of facts entitling him to relief).

■■ Upon consideration of a federal statute or regulation, the Court begins with a presumption of constitutionality. *See Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (stating that a statute is presumed constitutional); *INS v. Chadha,* 462 U.S. 919, 944, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (stating that statutes are presumed constitutional); *Fairbank v. United States,* 181 U.S. 283, 285, 21 S.Ct. 648, 45 L.Ed. 862 (1901) (stating that, for an act of Congress, "[t]he presumptions are in favor of constitutionality"). As the party challenging the statutory scheme, Plaintiffs bear the burden of demonstrating its unconstitutionality. *See Lujan v. G & G Fire Sprinklers, Inc.* —— U.S. ——, 121 S.Ct. 1446, 1452, 149 L.Ed.2d 391 (2001) (citing *INS v. Chadha,* 462 U.S. at 944, 103 S.Ct. 2764); *Heller,* 509 U.S. at 320, 113 S.Ct. 2637 ("The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.") (citing *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)).

Accompanying the presumption of constitutionality, the Court must determine what level of scrutiny to give the Congressional act at issue here. Different levels are applicable depending on the nature of a statute's restriction, if any, upon speech.

## C. *Intermediate Scrutiny Applies*

### 1. *SHVIA is Content–Neutral*

■ SHVIA is not subject to the highest level of scrutiny because neither its language nor its purpose is content-based. Regulations that are content-based on their face must survive the stringent mode of constitutional analysis termed "strict scrutiny." *See United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 812–14, 120 S.Ct. 1878, 1886, 146 L.Ed.2d 865 (2000); *Perry Educ. Ass'n v. Perry*

*Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). To survive strict scrutiny, a government regulation must be narrowly tailored to serve a compelling governmental interest. *See id.* The Court does not need to apply this level of scrutiny to SHVIA.

Plaintiffs cannot demonstrate that the statute on its face, or by its purpose, is unconstitutional, such that compelling satellite carriers to comply with the statute violates the carriers' First Amendment rights. First, the language of the statute does not evidence any content-based distinctions. The statute provides:

> In general: Subject to limitations of paragraph (2), each satellite carrier providing, under section 122 of title 17, United States Code, secondary transmissions to subscribers located within the local market of a television broadcast station of a primary transmission made by that station shall carry upon request the signals of all television broadcast stations located within that local market, subject to section 325(b).

47 U.S.C. § 338(a). Nowhere in the language of this "must-carry" provision is there any indication as to the kinds of local stations that must be carried, or the nature of the programs the local stations must carry. In fact, Plaintiffs have acknowledged that the language of the statute does not reflect a content preference:

> THE COURT: [I am asking] whether there is some particular message here that is favored over the other. Is there

any reference to ideas or views in the statute?

> MR. COOPER: No, your Honor, there is not.

(Tr. of Mot. to Dismiss Hearing at 40 (Feb. 9, 2001) (interchange between Plaintiffs' counsel and the Court).) The *Turner I* Court has noted that a law is content-based which, by its terms, distinguishes favored speech from disfavored speech on the basis of the ideas or views expressed. 512 U.S. at 643, 114 S.Ct. 2445. SHVIA is not such a law. The terms of the SHVIA must-carry provisions do not make any reference to any kind of speech or viewpoint. *See* 47 U.S.C. § 338(a).

The Supreme Court has already found a statute analogous to SHVIA's must-carry rules to be neutral on its face. *See, e.g., Turner I,* 512 U.S. at 643, 114 S.Ct. 2445. In *Turner I,* the Supreme Court ruled on the validity of cable must-carry requirements very similar to SHVIA's must-carry provisions. Cable's must-carry rules were more demanding than the provisions at issue here. A brief, contextual description is helpful. Similar to satellite broadcasting-and unlike traditional broadcast television-cable systems relied on physical, point-to-point connections between a transmission facility and the television sets of individual subscribers.[4] *Turner I,* 512 U.S. at 627–28, 114 S.Ct. 2445. Cable systems transmitted numerous channels to subscribers, but cable's channel capacity was limited. *See id.* at 628, 114 S.Ct. 2445. For the most part, cable operated as a conduit for the speech of others, not creat-

---

4. A satellite carrier's point-to-point connection is not physical. Instead, the connection is maintained through a satellite television subscriber's antenna or "dish." (Compl.¶ 23.) Yet, the dish operates like cable systems' point-to-point optical fibers or cables. Only cable subscribers connected to a cable operator's optical fiber or cable could receive programming transmitted by the op-

erator. Similarly, only satellite subscribers that have programmed dishes can receive programming transmitted by the satellite carrier. By contrast, any television owner within a broadcast station's range can receive the programming that traditional broadcast stations radiate, without having a contractual relationship with the broadcast station. *See Turner I,* 512 U.S. at 627–28, 114 S.Ct. 2445.

ing its own programming, but, instead, transmitting programs from outside sources, such as local or distant broadcast stations and national or regional cable programming networks (e.g., CNN, Black Entertainment Television, CourtTV, MTV, Comedy Central). The cable must-carry provisions required cable operators to carry the signals of a specified number of local broadcast television stations, depending on a system's channel capacity and its number of subscribers. *See id.* at 630, 114 S.Ct. 2445 (citing the 1992 Cable Act §§ 4, 5, 47 U.S.C. §§ 534(b)(1), (h)(1) (1988 ed., Supp. IV)). A cable system was only obligated to carry a broadcaster if the broadcaster requested carriage, and if more broadcasters requested carriage than a cable system was required to carry, the cable system could choose the stations it would carry. *See id.* at 631, 114 S.Ct. 2445. However, the broadcast signals carried under cable's must-carry provisions had to be transmitted on a continuous basis and had to be placed in the same numerical channel position as when broadcast over the air by traditional television broadcast media.

First, the Supreme Court in *Turner I* found that cable operators were engaged in speech. *See id.* at 636, 114 S.Ct. 2445. Operators communicated messages on a wide variety of topics and in a wide variety of formats through the operators' original programming or exercise of editorial discretion over which stations or programs to include in their repertoire. *See id.; see also Miami Herald,* 418 U.S. at 258, 94 S.Ct. 2831 (finding that newspapers engage in speech by making editorial decisions as to the size and content of the paper, the material that will go into the paper, and the treatment of public issues and public officials). Next, the *Turner I* Court held that the cable must-carry rules regulated cable operators' speech by reducing the number of channels over which operators could exercise unrestricted con-

trol and by reducing the number of channels for which the operators could compete. *See Turner I,* 512 U.S. at 636–37, 645, 114 S.Ct. 2445. However, the Court further held that "the must-carry rules, *on their face,* impose[d] burdens and confer[red] benefits *without reference to the content of speech." Id.* at 643, 114 S.Ct. 2445 (emphasis added). The Court concluded that the speech burdens imposed by the cable must-carry provisions were not *per se* unconstitutional because they were unrelated to content, for the limitations extended to all cable programmers, irrespective of the programming they chose to offer viewers. *See id.* at 644–45, 114 S.Ct. 2445. "Nothing in the Act impose[d] a restriction, penalty, or burden by reason of the views, programs, or stations the cable operator ... selected or [would] select." *Id.* at 644, 114 S.Ct. 2445.

Similarly, the SHVIA must-carry provisions contain nothing that restrict, penalize, or burden based on the views, programs, or stations that a satellite carrier might select. In the same manner as cable, satellite transmission constitutes speech. *See id.* at 636, 114 S.Ct. 2445. Satellite operates predominantly as a conduit for speech, but satellite carriers communicate ideas through their programming selection. Like cable's must-carry rules, SHVIA's must-carry provisions obligate a satellite carrier to carry a number of local stations within designated market areas, but with the less stringent condition that carriers need only do so if the carriers elect to carry any one local station in a DMA. *See* 47 U.S.C. § 338(a). In addition, like cable's must-carry rules, SHVIA regulates speech "based only upon the manner in which speakers [i.e., stations] transmit their messages to viewers, and not upon the messages they carry." *Turner I,* 512 U.S. at 645, 114 S.Ct. 2445. Generally, laws that confer benefits or impose bur-

dens on speech without reference to the ideas or views expressed are content neutral. *See Turner I,* 512 U.S. at 643, 114 S.Ct. 2445. Therefore, SHVIA's must-carry regulations are at least as facially neutral as the cable must-carry rules.[5]

Under SHVIA's must-carry provisions, satellite carriers must choose which television station, or "speaker," the carrier will carry. Plaintiffs argue that they will have to carry the "speech" of more local stations than they would otherwise choose. However, a differential burden on speakers alone is not sufficient to raise First Amendment concerns. *See Leathers,* 499 U.S. at 452, 111 S.Ct. 1438. Speaker-based laws demand strict scrutiny only "when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Turner I,* 512 U.S. at 658, 114 S.Ct. 2445; *see also Rosenberger,* 515 U.S. at 828, 115 S.Ct. 2510 (holding that the "government offends the First Amendment when it imposes financial burdens on certain speakers *based on the content of their expression* ") (emphasis added).

The Supreme Court has held explicitly that *Miami Herald* does not govern a context such as this one: "Unlike the access rules struck down in [*Miami Herald* ], the must-carry rules are content neutral in application. They are not activated by any particular message spoken by cable operators and thus exact no content-based penalty." *Turner I,* 512 U.S. at 655, 114 S.Ct. 2445. In *Miami Herald,* the choice of speaker necessarily carried with it a point of view. *See Miami Herald,* 418 U.S. at 256, 94 S.Ct. 2831. *Miami Herald* involved a requirement that newspapers grant a "right-to-reply" to an editorial viewpoint printed in the newspaper. Where a newspaper makes the decision to print an editorial on a certain political viewpoint, requiring the paper to print the opposing view amounts to compelling the expression of a point of view at odds with view the editor chose to express. *See id.* at 257–58, 94 S.Ct. 2831 (stating also that the right-to-reply statute would chill newspaper editors' speech by deterring them from speaking in unfavorable terms about a political candidate). The newspaper's situation is distinguishable from the situation here. Congress' grant of a copyright license that includes the requirement that local stations within a DMA be carried along with satellite carriers' premium programming does not implicate any point of view. SHVIA's must-carry provisions require the broadcast of speech based solely on the geographic location of a station within a particular media market, without regard to the messages or viewpoints conveyed in the station's programming. *Cf. Turner I,* 512 U.S. at 645, 114 S.Ct. 2445 (holding that cable's must-carry provisions distinguished between speakers, but where the provisions distinguished only upon the manner in which the speakers transmitted their messages, the provisions did not distinguish on the basis of the messages the speakers carried). Moreover, the must-carry provisions of SHVIA do not prescribe which local broadcast stations a satellite carrier may retransmit. The carrier opts to invoke the SHVIA license and to carry local stations in a particular market. *See* H.R. REP. No. 106–464, at 101 (stating that SHVIA allows carriers to choose whether to incur the must-carry obligation in a particular market). Therefore, using

---

**5.** SHVIA's regulations are arguably less burdensome than cable's because they do not contain a strict requirement that satellite carriers carry local stations. Satellite carriers become obligated under SHVIA's must-carry provisions only if they choose to carry a station in a particular market area. *See* 47 U.S.C. § 338(a).

*Turner I's* language, Congress' preference for local "speakers" as expressed in SHVIA is unrelated to "what the favored speakers have to say." 512 U.S. at 658, 114 S.Ct. 2445. SHVIA's facial neutrality weighs against a strict scrutiny analysis of SHVIA's must-carry provisions. However, the determination that the must-carry provisions, on their face, do not burden or benefit speech based on content does not end the inquiry; it is also necessary to determine whether the must-carry regulations are content-based in their purpose. *See id.* at 643, 114 S.Ct. 2445

SHVIA's must-carry provisions are not content-based by their purpose. Both the House and Senate have stated numerous times and in numerous ways that the purposes behind SHVIA are to promote competition in television and to protect customers from rate increases, *see* H.R. REP. No. 106–79 (Part I), at 11 (1999); S. REP. No. 106–51 at 2 (1999), to promote healthy competition in industry, *see id.;* H.R. REP. No. 106–464, at 93–94 (stating SHVIA would eliminate any competitive disadvantage of satellite carriers, while creating parity and enhanced competition between satellite and cable television in the provision of local television broadcast stations), and to maintain free over-the-air television, *see* H.R. REP. No. 106–464, at 101. Without the limitations on the use of copyrighted works and the retransmission of local stations, Congress feared that satellite carriers' market share would increase, and local broadcasters would be prevented from reaching local viewers. These are not viewpoint-related concerns.

Plaintiffs argue that Congress imposed the must-carry conditions of § 338 in order to manipulate the editorial decisions and policies of satellite carriers. As support, Plaintiffs cite the House of Representatives Report: "The Conference Committee is concerned that, absent must-carry obli-

gations, satellite carriers would carry the major network affiliates and a few other signals." H.R. REP. No. 106–464, at 101. However, a mere incidental effect on the carriers' editorial decisions does not amount to content-based regulation of speech. The Supreme Court has noted that the principal inquiry in determining whether legislation is content neutral is to examine "whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." *Turner I,* 512 U.S. at 642, 114 S.Ct. 2445 (alteration in original). There has been no indication or offer of evidence that network affiliates carry a certain kind of speech, or that local stations carry a certain kind of speech. Therefore, Congress' intent to ensure that local stations are retransmitted by satellite carriers is not based on the content of speech. Congress seeks to ensure that local stations are retransmitted, *regardless of the content of the station.* An intent to provide consumers with more than just network affiliates, to ensure competition between cable and satellite, and to ensure access to free television programming is unrelated to the content of the channels that Congress wants the satellite carriers to retransmit. *See id.* at 647, 114 S.Ct. 2445 (holding that the overriding congressional purpose of ensuring that every individual has access to free television programming was unrelated to the content of expression disseminated by cable and broadcast speakers, where must-carry rules ensured that broadcast television stations would retain a large enough potential audience to earn necessary advertising revenue, or sufficient viewer contributions, to maintain their continued operation). Thus, SHVIA's manifest purpose is not "to regulate speech because of the message it conveys." *Id.* at 642, 114 S.Ct. 2445. Therefore, SHVIA's purpose is content-neutral. *See id.* Accordingly, the must-

carry provisions are not subject to strict scrutiny. *See id.* at 662, 114 S.Ct. 2445 (concluding that must-carry provisions that were neutral on their face and in their purpose were subject to intermediate scrutiny).

### 2. *Rational Basis Test Does Not Apply*

Intervenor Defendants argue that the Court should review SHVIA using rational basis scrutiny, not intermediate scrutiny; but rational basis scrutiny is not the appropriate analytical scheme under which to review SHVIA's must-carry provisions. The Supreme Court has already held that provisions such as those at issue here regulate speech. *See Turner I,* 512 U.S. at 638–39, 114 S.Ct. 2445. Therefore, a heightened standard of scrutiny is most appropriate. *See id.* at 640–41, 114 S.Ct. 2445. Moreover, the Supreme Court expressly rejected the application of the rational basis test to this context. *See id.* The *Turner I* Court held that the scarcity rationale which made the rational basis test appropriate in *Red Lion,* 395 U.S. at 388, 89 S.Ct. 1794, did not apply to media that did not suffer the inherent limitations that characterize the broadcast medium (e.g., cable). *See id.* at 639, 114 S.Ct. 2445. The Court further held that the physical characteristics of cable do not require the alteration of settled principles of First Amendment jurisprudence. *See id.* Therefore, the Court held that the heightened standard of intermediate scrutiny was more appropriate than rational basis scrutiny to review cable's must-carry rules. This Court notes that numerous courts have questioned and/or declined to extend the *Red Lion* rationale. *See, e.g., In re Complaint of Syracuse Peace Council against Television Station WTVH,* 2 F.C.C.R. 5043, 1987 WL 344763 (1987),

*aff'd, Syracuse Peace Council v. FCC,* 867 F.2d 654 (D.C.Cir.1989); *Chesapeake & Potomac Tel.,* 42 F.3d at 190, *vacated on grounds of mootness,* 516 U.S. 415, 116 S.Ct. 1036, 134 L.Ed.2d 46 (1996); *Turner I,* 512 U.S. at 637–40, 114 S.Ct. 2445. *But see Time Warner Entertainment v. FCC,* 93 F.3d 957, 975 (D.C.Cir.1996) (holding that satellite technology is subject to similar limitations as traditional broadcast media and should be analyzed under the same relaxed standard of scrutiny applied to traditional broadcast). In fact, in a decision involving traditional broadcasters subsequent to *Red Lion,* the Supreme Court applied intermediate scrutiny. *See League of Women Voters,* 468 U.S. at 380, 104 S.Ct. 3106. In *League of Women Voters,* the Supreme Court referred to and recapped its decision in *Red Lion,* reasserted its belief that "the broadcast industry operates under restraints not imposed upon other media," then held that the regulations at issue would only be upheld if they survived *intermediate* scrutiny. *See id.,* 468 U.S. at 380, 104 S.Ct. 3106 (stating that regulations upon broadcasters had only been upheld when the restrictions were narrowly tailored to further a substantial government interest) (citing, *inter alia, Red Lion,* 395 U.S. at 377, 89 S.Ct. 1794).

Intervenor–Defendants argue that the *Red Lion* rational basis test is appropriate here because, like traditional broadcasting, satellite transmission is subject to physical limitations. However, there is no evidence before the Court to support Intervenor–Defendants' assertion. Noting the lack of factual development of this point, Plaintiffs have emphasized that their challenge to the must-carry provisions is a facial challenge, not an as-applied challenge.[6] (Pl.

---

**6.** Plaintiffs previously placed a motion for summary judgment before the Court, arguing

that SHVIA's must-carry provisions infringed Plaintiffs First Amendment rights in light of

Opp'n to Mot. to Dismiss at 3.) Therefore, this Court holds that rational basis analysis is not appropriate here, and, instead, analyzes the satellite must-carry provisions using intermediate scrutiny.

### D. SHVIA's Must–Carry Survives Intermediate Scrutiny

 Regulations that are content-neutral but place an incidental burden on speech are subject to intermediate scrutiny. *See O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673. SHVIA's must-carry provisions do not violate the First Amendment because they satisfy every part of the intermediate scrutiny test. Under the intermediate scrutiny test, "[a] content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner II*, 520 U.S. at 189, 117 S.Ct. 1174 (citing *O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673). The four-part test for intermediate scrutiny provides that a government regulation is sufficiently justified (1) if it is within the constitutional power of the Government; (2) if it furthers an important or substantial governmental interest; (3) if the governmental interests that the regulation further are unrelated to the suppression of free expression; and (4) if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of the governmental interests. *See O'Brien*, 391 U.S. at 377, 88 S.Ct. 1673. A regulation need not be the least speech-restrictive means of advancing the Government's interest to satisfy the intermediate scrutiny

standard. *See Turner I*, 512 U.S. at 662, 114 S.Ct. 2445 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).

### 1. Congressional Authority

 Plaintiffs argue that Congress exceeds its enumerated powers when it conditions the use of a statutory copyright license on the display of copyrighted works carried on local stations. This Court holds that Congress has acted well within its powers under the Copyright Clause of the United States Constitution in promulgating the limited license under SHVIA. *See* U.S. CONST., art. I, § 8, cl. 8. The Copyright Clause states that "Congress shall have Power To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." *Id.* In large part, Plaintiffs take issue with the existence of the copyright laws themselves. (Pl. Opp. at 11, 21–24.) In essence, Plaintiffs argue that it is wrong of Congress to impose restrictions on the ability of broadcasters to "retransmit any broadcast programming in any market without anyone's permission," and then condition lifting those restrictions on satellite carriers' willingness to support the public policy of providing a multiplicity of voices and exposure to viewers. (*Id.*) However, Congress has the power to use copyright, *or exceptions thereto*, to promote particular types of work, or works by particular authors, in preference to other types of works or authors. *See Goldstein*, 412 U.S. at 562, 93 S.Ct. 2303 (stating that Congress has discretion to decide what types of works are

satellite's limited channel capacity. Plaintiffs asserted that the must-carry provisions would narrow satellite carriers' speech choices because the majority of carriers "speech" space would be commanded by local television sta-

tions. However, Plaintiffs have withdrawn this argument and have asserted only facial unconstitutionality in their opposition to Defendants' motions to dismiss.

to be covered by the federal statutory scheme); *Sony*, 464 U.S. at 429, 104 S.Ct. 774 (stating that Congress has discretion to decide the scope of an author or inventor's copyright protection). "[I]t is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors or to inventors in order to give the public appropriate access to their work product." *Id.* The Supreme Court has held that Congress' regulatory decisions that address public policy interests in the realm of copyright are entitled to substantial deference. *See id.* at 431, 104 S.Ct. 774 (stating that policy and history supports the Supreme Court's consistent deference to Congress when major technological innovations alter the market for copyrighted materials). Moreover, in considering the interests of authors and inventors, Congress may also consider issues of commerce. *See id.* at 429, 104 S.Ct. 774; *Goldstein*, 412 U.S. at 562, 93 S.Ct. 2303. Congress' stated intent in creating the SHVIA license is to (1) "promote competition in the marketplace for delivery of multichannel video programming ... to reduce costs to consumers;" (2) "protect[ ] and foster[ ] the system of television networks by encourag[ing] and promot[ing] retransmissions by satellite of local broadcast stations to subscribers who reside in the local markets of those stations;" (3) "preserve free television for those not served by satellite and cable systems;" and (4) "promote the widespread dissemination of information from a multiplicity of sources." H.R. REP. No. 106–464 at 91–92, 101. These goals are within Congress' authorities recognized by the United States Supreme Court. *See Sony*, 464 U.S. at 429, 104 S.Ct. 774; *Goldstein*, 412 U.S. at 562, 93 S.Ct. 2303. Therefore, Plaintiffs' argument that it is unconstitutional for Congress to make exceptions to

its copyright protections under certain circumstances fails.

The satellite must-carry provisions are a prime example of an exception to copyright that is used to promote the works of potentially unrecognized copyright owners. The majority of stations obtain revenues through advertising. In turn, stations compensate copyright owners who provide programming to the stations. The wider the viewer base, the more revenues in advertising a station may receive. Therefore, popular shows (e.g., "Dateline," "Friends," or "Oprah") can make more money from advertisements purchased to run during their breaks than unpopular shows. Consequently, stations may not elect to broadcast less popular shows, or programs that interest only a small audience (e.g., a local audience). By permitting all local stations in a particular market to be retransmitted, Congress enables copyrighted works displayed on non-network affiliates to be promoted, in addition to those on network affiliates. Thereby, copyright owners who display their work on local stations have an opportunity to receive compensation for their work, and, at the same time, to provide a diversity of views out of "mainstream" popularity. *See* H.R. REP. No. 106–464, at 101 (stating that a purpose of SHVIA is to satisfy the strong public interest in providing viewers with information from a variety of sources); H.R. REP. No. 106–6, at 4 (1999) (stating that local television stations need advertising revenue to continue to broadcast the public affairs and news programming for people in their communities). The SHVIA § 122 license and § 338 must-carry provisions further these goals. Therefore, Congress has acted within its authority in promulgating SHVIA.

*2. Important Governmental Interest*

■ The Supreme Court has held that the same interests that form the basis for

SHVIA are "important governmental interests." *See Turner I*, 512 U.S. at 663, 114 S.Ct. 2445; *Turner II*, 520 U.S. at 189, 117 S.Ct. 1174. In promulgating the cable's must-carry provisions, Congress declared that the provisions served three interrelated interests: "(1) preserving the benefits of free, over-the-air local broadcast television, (2) promoting the widespread dissemination of information from a multiplicity of sources, and (3) promoting fair competition in the market for television programing." *See Turner I*, 512 U.S. at 662, 114 S.Ct. 2445 (citing S. REP. No. 102–92, at 58 (1991); H.R. REP. No. 102–628, at 63 (1992), U.S. CODE CONG. & ADMIN. NEWS 1992, at 1191; 1992 Cable Act §§ 2(a)(8), (9), (10)). As indicated above, these are the same interests Congress articulated as the basis for the SHVIA must-carry provisions. *See infra* section III. C.1. The Supreme Court has held that these are substantial and legitimate interests. *See Turner I*, 512 U.S. at 662–63, 114 S.Ct. 2445 (citations omitted). Individuals must retain access to local broadcast media. Local broadcast stations provide a source of information and an outlet for the exchange of matters of local concern. *See id.* at 663, 114 S.Ct. 2445. Satellite carriers' decisions not to broadcast particular local stations can result in decreased advertising revenues for those stations. Consequently, those stations may be unable to sustain their business and might cease to broadcast. Protecting non-satellite households from loss of regular television broadcasting is an important federal interest. *See id.* (citing *Capital Cities Cable*, 467 U.S. at 714, 104 S.Ct. 2694 (stating as much in relation to the potential effects of cable)). In addition, local stations provide a wide range of voices. The Supreme Court has held that "assuring that the public has access to multiplicity of information sources is a governmental purpose of the highest order . . .; the widest possi-

ble dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *Id.* (citations and internal quotations omitted). As to promoting fair competition, the Court has held that eliminating restraints on competition is always a substantial interest. *See id.* at 664, 114 S.Ct. 2445. This is the case even where, as here, the entities subject to regulation are engaged in expressive activity protected by the First Amendment. *See id.* (citing *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951)). Thus, all of the interests that SHVIA is meant to further are substantial and important interests for purposes of the intermediate scrutiny test.

Plaintiffs argue that the interests articulated above cannot support a finding that SHVIA's must-carry provisions are constitutional because these interests are different from those forming the basis of the Copyright Act. The Copyright Act's purpose is to encourage creative freedoms, while the must-carry provisions seek to create fair competition. Plaintiffs' arguments miss the mark. The Copyright Act, and SHVIA's § 122 license creating an exception to the Copyright Act's effects, need not be based on identical interests. The key inquiry is whether Congress has a substantial interest in creating the exception to the Copyright Act. As detailed above, Congress does have substantial and important interests in creating the § 122 license. Moreover, these interests are related to Congress' Copyright power, because fair competition encourages creative freedom. Television writers and producers need a variety of outlets for their broadcast works. Local television, and public and educational television outlets are vital sources for the wide dissemination of creative works. National networks and premium cable channels form additional outlets for television writers and

producers. SHVIA's license advances television writers and producers' creative freedoms by affording these artists' works wider dissemination over multiple broadcast avenues.

### 3. Interests Unrelated to Free Expression

Under the O'Brien intermediate scrutiny test, a governmental interest that a regulation seeks to further must not only be substantial, it must also be "unrelated to the suppression of free expression." O'Brien, 391 U.S. at 377, 88 S.Ct. 1673. As indicated in the discussion of the basis of SHVIA's must-carry provisions, see infra section III.C.1., SHVIA's must-carry regulations are neither view-point oriented on their face or in their purpose. Moreover, the Supreme Court has held that the important governmental interests articulated above are unrelated to the suppression of free expression or the content of any speakers' messages. See Turner I, 512 U.S. at 663, 114 S.Ct. 2445 (citations omitted).

### 4. Sufficiently Narrowly Tailored

A determination that SHVIA seeks to further substantial government interests is not sufficient if SHVIA places an incidental restriction on alleged First Amendment freedoms greater than is essential to the furtherance of those interests. See O'Brien, 391 U.S. at 377, 88 S.Ct. 1673. The question of whether must-carry provisions unduly burden an entity that retransmits television stations was left open in Turner I, but resolved in Turner II. See Turner I, 512 U.S. at 664–65, 114 S.Ct. 2445 (stating that, on the record before that Court, the Court was unable to conclude whether the Government had satisfied its burden that the cable must-carry provisions did not burden substantially more speech than necessary to further the government's legitimate interests); Turner II, 520 U.S. at 216–17, 117 S.Ct. 1174 (holding that the evidence demonstrated that cable's must-carry provisions were narrowly tailored to achieve the ends for which they were intended). This Court finds that SHVIA's must-carry obligations are even less burdensome than the cable must-carry obligations upheld in Turner II. Therefore, the SHVIA obligations are not overly burdensome on satellite carriers.

The must-carry limitations on a satellite carrier's receipt of the valuable, discretionary license does not unduly burden the carrier's First Amendment rights because the viewpoints expressed by a carrier remain within the carrier's control. First, given satellite's role as a conduit for broadcast signals, there is little risk that satellite viewers would assume that the stations carried on a satellite system convey the ideas or messages endorsed by the satellite carrier. See Turner I, 512 U.S. at 655, 114 S.Ct. 2445 (stating the same about cable operators). Second, the must-carry provisions of SHVIA are less restrictive than the cable must-carry provisions because they do not mandate that satellite carriers carry a prescribed number of cable stations, see 47 U.S.C. § 338(a) (conditioning must-carry obligations on carrier's choice to employ § 122 license in a particular DMA), or that carriers broadcast stations on specific numeric channels, see 47 U.S.C. § 338(d) (stating that satellite carriers need not provide signal of local station on any particular channel number or in any particular order). Cf. 1992 Cable Act §§ 4, 5, 47 U.S.C. §§ 534(b)(1), (h)(1). In addition, unlike cable operators, satellite carriers are given the option of which local stations they will broadcast. Use of the § 122 license is voluntary, so a carrier need only expose itself to carriage of all local stations in the carrier's markets of choice. Through these limitations on the

scope of satellite's must-carry provisions, it is apparent that "Congress took steps to confine the breadth and burden of the regulatory scheme." *Turner II*, 520 U.S. at 216, 117 S.Ct. 1174 (finding that Congress confined the burden of cable's must-carry schema-which had fewer limitations than the satellite schema at issue here). Therefore, SHVIA's must-carry provisions are narrowly tailored to perform Congress' goals. *See id.* at 215–16, 117 S.Ct. 1174.

Notwithstanding the voluntary nature of the SHVIA license, Plaintiffs argue that the must-carry obligations are overly burdensome because carriers must sacrifice their editorial discretion. "[T]he doctrine of unconstitutional conditions limits the government's ability to make [carriers] surrender constitutional rights even to obtain an advantage that could otherwise be withheld." *Clifton v. Fed. Election Comm'n*, 114 F.3d 1309, 1315 (1st Cir. 1997), *cert. denied*, 522 U.S. 1108, 118 S.Ct. 1036, 140 L.Ed.2d 103 (1998). The copyright laws prohibit carriers from broadcasting copyrighted works without the permission of copyright owners. Through SHVIA, a carrier gains the advantage of unrestricted broadcasting of copyrighted works. Thus, the SHVIA license amounts to an opportunity to obtain an advantage that could otherwise be withheld. However, obtaining this advantage is not contingent upon the surrender of First Amendment rights. As indicated above, neither on its face nor by its purpose does the statute prefer one viewpoint over another. *See* 47 U.S.C. § 338. Therefore, satellite carriers' choice of speech is not unduly affected by § 338's must-carry provision.

Furthermore, editorial discretion is preserved because it is an individual satellite carrier, not Congress, that decides whether the carrier will take advantage of the § 122 license, or opt to negotiate with individual owners of copyrighted works:

Rather than require carriage of stations in the manner of cable's mandated duty, this Act allows a satellite carrier to choose whether to incur the must-carry obligation in a particular market in exchange for the benefits of the local statutory license. . . . Satellite carriers remain free to carry any programming for which they are able to acquire the property rights. The provisions of this Act allow carriers an easier and more inexpensive way to obtain the right to use the property of copyright holders when they retransmit signals from all of a market's broadcast stations to subscribers in that market. The choice whether to retransmit those signals is made by carriers, not by the Congress.

H.R. Rep. No. 106–464, at 101. Although Plaintiffs argue that it is "wholly impractical" to negotiate individually with the holder of every copyrighted work aired by a local station, (Pl. Opp. at 12), it is not impossible to negotiate individually. Plaintiffs may exercise the full range of their editorial discretion by opting not to take advantage of the § 122 license. Plaintiffs' choice to conform to "the broadcast industry's business practices" and avoid negotiating individually for copyright retransmission rights is Plaintiffs' business decision. (*Id.* at 12 n. 4.) Therefore, foregoing the benefits of the § 122 license in the interest of their editorial discretion is not, as Plaintiffs describe, "a choice between exercising First Amendment rights and obtaining the benefit," *Brooklyn Inst. of Arts & Sciences v. City of New York*, 64 F.Supp.2d 184, 200 (E.D.N.Y.1999) (holding that although government is not obligated to provide various benefits, it may not deny them if reason for denial is the choice between exercising First Amendment rights and obtaining the benefits), instead, it is a choice between the benefit and an unpreferred business practice. The Government does not violate the First

Amendment by offering Plaintiffs such a choice. *See Rust,* 500 U.S. at 199 n. 5, 111 S.Ct. 1759 (stating that the Government does not violate the First Amendment by offering a potential recipient of a benefit (i.e., a subsidy) the choice between accepting the benefit and the force of its regulations, and declining the benefit). For these reasons, SHVIA is sufficiently narrowly tailored to be constitutional.

### E. *Congress has not Exceeded Authority*

■■■ SHVIA creates a license, not a subsidy. Although Congress conceived of the SHVIA license as "a matter of legislative grace, in the nature of subsidies to satellite carriers," H.R. REP. No. 106–464, at 101, the SHVIA license is not a subsidy. The parties engage in an extensive debate about whether the license granted by § 122 is a subsidy. Defendants argue that a satellite carriers' license to broadcast copyrighted works without obtaining permission from the owners of the copyrighted works is a benefit upon which Congress can place conditions. Plaintiffs argue that the SHVIA license is not a subsidy because subsidies are an exercise of Congress' spending power, not its regulatory power. Plaintiffs argue further that, through SHVIA, Congress is regulating inappropriately to favor one type of speech over another. The Court finds that language used to define and describe a "subsidy" makes clear that the SHVIA license does not qualify. Legal and lay dictionaries define a subsidy as "a grant of money:"

> **Subsidy.** A grant of money made by government in aid of the promoters of any enterprise, work, or improvement in which the government desires to participate, or which is considered a proper subject for government aid, because such purpose is likely to be of benefit to the public.

BLACK'S LAW DICTIONARY 1428 (6th ed.1990); *see also* RANDOM HOUSE WEBSTER'S COLLEGE

DICTIONARY 1306 (2000) (defining "subsidy" as: "**1.** a direct financial aid furnished by a government, as to a private commercial enterprise, an individual, or another government. **2.** any grant or contribution of money"); THE AMERICAN HERITAGE DICTIONARY 1213 (2d College ed.1991) (defining "subsidy" as: "**1.** Monetary assistance granted by a government to a person or a private commercial enterprise. **2.** Financial assistance . . . ."). In addition, Government subsidies come under the heading "Appropriation Accounting" and refer to sums "payable" in the United States Code. *See* 31 U.S.C.A. § 1501(a)(5) (1983) and accompanying Notes.

Section 122 of SHVIA does not grant a "subsidy" because it does not entail the grant of government funds, or other benefits obtained through the use of government funds (i.e., property, government-created jobs, etc.), to confer a benefit. *See* 17 U.S.C. § 122. Subsection 122(c) provides that satellite carriers regulated under § 122 do not have to pay royalty fees to copyright owners, but if this is considered a grant of money (i.e., by way of a payment exemption), the money savings are derived from the copyright owners, not from the Government. Absent § 122(c), satellite carriers would have to pay copyright owners to retransmit copyrighted works, not pay the Government. *See id.* (setting "limitations on [a copyright owner's] exclusive rights"). Therefore, because § 122 does not amount to a benefit conferred through the expenditure of government funds, § 122 is not accurately characterized as a subsidy.

Section 122 is most accurately characterized as a license. A license is defined as "[t]he permission by competent authority to do an act which, without such permission, would be illegal, a trespass, a tort, or otherwise not allowable." BLACK'S LAW DICTIONARY 920. Section 122 grants a li-

cense because, without its provisions, a satellite carrier would not be permitted to retransmit copyrighted works without gaining permission from copyright owners or paying royalties. The Copyright Act would prohibit such transmission. Defendants treat the SHVIA benefit like a subsidy because § 122 grants a benefit that satellite carriers would not have otherwise, just as a subsidy does. However, licenses perform the same purpose. In addition, both can serve to increase competition by giving the entities in receipt of the subsidies or licenses an ability to challenge another force in the market (e.g., cable systems). Yet, simply because both subsidies and licenses enure a benefit does not mean they are one and the same.

 Congress cannot make the receipt of a valuable government license contingent upon the recipient's surrender of its First Amendment rights. *See Chesapeake & Potomac Tel.*, 42 F.3d at 185, 192. If § 122 were a subsidy, Congress could favor one message over another, because the Government is entitled to expend funds on certain programs and not on others in order to promote particular messages and interests. *See, e.g., Rosenberger*, 515 U.S. at 834, 115 S.Ct. 2510; *Rust*, 500 U.S. at 196, 111 S.Ct. 1759. However, Congress may not use its regulatory powers to influence or penalize speech. *See Miami Herald*, 418 U.S. at 256–58, 94 S.Ct. 2831 (holding that a right to reply statute improperly influenced a newspaper's speech); *Pacific Gas & Elec.*, 475 U.S. at 16, 106 S.Ct. 903 (holding that requirement that utility company include a consumer group's critical newsletter in its customer bills improperly influenced speech); *American Communications Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 402, 70 S.Ct. 674, 94 L.Ed. 925 (1950) (holding that speech-contingent withdrawal of opportunity to invoke the facilities of the National Labor Relations Board improperly abridged speech); *see also Speiser*, 357 U.S. at 518, 78 S.Ct. 1332 (holding that use of taxing power to deny a tax exemption for engaging in particular speech was an impermissible limitation on free speech). The Supreme Court has held that although an entity has no right to a valuable governmental benefit, and though the government may deny a benefit for a number of reasons, an entity may not be denied a benefit on a basis that infringes its constitutionally protected interests, especially the interest in freedom of speech. *See Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Therefore, regulators creating licenses must observe the standard rule that government regulation may not favor one viewpoint over another. *See, e.g., Speiser*, 357 U.S. at 518, 78 S.Ct. 1332; *Rosenberger*, 515 U.S. at 828, 115 S.Ct. 2510. This Court holds that the Government did not exercise its regulatory powers improperly by making the § 122 license contingent upon satellite carriers carrying all local stations within a DMA.

The must-carry conditions on use of the § 122 license are not unconstitutional because, as explained in great detail above, the must-carry provisions do not infringe on satellite carriers' First Amendment rights. The SHVIA condition requiring carriers to carry all local stations in a DMA if the carrier chooses to carry one local station in a DMA is not based on the particular "speech" or "expression" of any local station. Therefore, in regulating through SHVIA, Congress is not attempting to influence or penalize speech. *Cf. Miami Herald*, 418 U.S. at 256–58, 94 S.Ct. 2831; *Pacific Gas & Elec.*, 475 U.S. at 16, 106 S.Ct. 903; *Speiser*, 357 U.S. at 518, 78 S.Ct. 1332.

 Moreover, Congress cannot be said to "deny" a benefit on the basis of

satellite carriers' speech choices because carriers are not required to take advantage of the § 122 license. If carriers choose not to invoke the copyright license created by § 122, they "remain free to carry any programming for which they are able to acquire the property rights." H.R. REP. No. 106–646, at 101. The need to obtain property rights or pay royalties to copyright owners on an individual basis absent utilization of the § 122 license does not violate the carriers' First Amendment rights, because there is no First Amendment right to make unrestricted commercial use of the copyrighted works of others. *See, e.g., Harper & Row, Publishers v. Nation Enters.*, 471 U.S. 539, 555–60, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (indicating that restrictions created by copyright laws do not violate First Amendment); *Zacchini v. Scripps–Howard Broad. Co.*, 433 U.S. 562, 574–75, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977) (holding that the First Amendment does not entitle media to broadcast a performer's entire act without his consent); *United Video v. Fed. Communications Comm'n*, 890 F.2d 1173, 1191 (D.C.Cir.1989) ("In the present case, the petitioners desire to make commercial use of the copyrighted works of others. There is no first amendment right to do so."). The statutory copyright license created by SHVIA makes it easier, and perhaps more affordable, for satellite carriers to broadcast copyrighted works, and thereby encourages carriers to take advantage of the license. The accompanying requirement to comply with the must-carry provisions then accomplishes the legislative goals of ensuring consumer access to free television, promoting competition, and providing for the broadcast of a range of viewpoints. Governmental encouragement of activity consonant with legislative policy does not violate the First Amendment. *See Finley*, 524 U.S. at 587–88, 118 S.Ct. 2168. There-

fore, Congress has not exceeded its authority in promulgating SHVIA.

### F. *Remaining Causes of Action*

Aside from their First Amendment argument, Plaintiffs also argue that SHVIA's must-carry provisions effect a taking of their property, and that the must-carry provisions violate due process. Plaintiffs assert that § 338 grants local television broadcast stations an easement authorizing them to interconnect with, and permanently physically occupy, a portion of a satellite carrier's real property, facilities, and spectrum. (Compl.¶ 10.) Plaintiffs contend that this "federally-mandated transfer of private property from one person to another, without substantial or legitimate public purpose," violates the Takings and Due Process Clauses of the Fifth Amendment. (*Id.* ¶¶ 10, 91–97, 100.) The Court rejects both of these arguments, but addresses both briefly.

#### 1. *SHVIA Does Not Effect a Taking*

SHVIA does not effect a *per se* or a regulatory taking. A *per se* taking occurs when a regulation compels an actual physical invasion of one's property. *See Front Royal*, 135 F.3d at 285 (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). Such a physical invasion is considered a taking, no matter how slight the invasion or how weighty the public interest forming the basis of the regulation. *See id.* An occupation of another's property is a permanent physical occupation constituting a taking if the property owner has no right to possess or control the occupied space, has no power to exclude the occupier from the possession and use of the property, or the owner has its value in the property eliminated because the owner cannot sell the occupied property for valuable use to another. *See Loretto v. Tele-*

*prompter Manhattan CATV Corp.*, 458 U.S. 419, 435–36, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). SHVIA's must-carry regulations do not effect a *per se* taking because, first, satellite owners retain possession and control over their facilities and programming. As indicated above, the SHVIA license is voluntary and applies only on a market-by-market basis. Therefore, satellite carriers can always determine which local stations they will carry, if any at all. Second, for the same reasons, satellite carriers retain the ability to exclude local stations from possessing and using carriers' facilities. Finally, SHVIA does not render carriers' facilities and programming capabilities value-less. SHVIA need not have any effect on a carrier at all if the carrier does not take advantage of the § 122 statutory copyright license. Yet, if the carrier does take advantage of the license, the carrier's decision to do so is based on the carrier's determination that the license to broadcast copyrighted works without paying royalties to individual copyright owners is more valuable than foregoing the license.

■■■■ Also, SHVIA's must-carry provisions do not effect a regulatory taking. A regulatory taking occurs if regulations deny a property owner all economically beneficial or productive use of the property. *See Agins v. City of Tiburon*, 447 U.S. 255, 260–61, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (describing a regulatory taking of land). Courts examine three factors to determine whether a regulatory taking has occurred: (1) the economic impact of the regulation on the property owner; (2) the extent to which the regulation has interfered with distinct, investment-backed expectations; and (3) the character of the governmental action. *See Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224–25, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (citation omitted). SHVIA does not

effect a regulatory taking because, first, as explained above, the must-carry regulations need not have any economic impact. Any economic impact that the must-carry regulations have is decided by carriers on an individual basis, depending on whether they take advantage of the copyright license. Second, § 338 does not interfere with reasonable investment expectations because satellite carriers do not have a reasonable, investment-backed expectation that they will have unrestricted use of specific copyrighted works of others. Therefore, SHVIA does not effect a taking by making conditional a carrier's relief from the restrictions imposed by the copyright laws. Finally, § 338 does not permanently invade or appropriate a carriers' assets for governmental use. Consequently, the character of the SHVIA governmental action does not suggest a taking. For these reasons, the Court holds that SHVIA's must-carry provisions do not effect a regulatory taking of Plaintiffs' property.

2. *SHVIA Conforms with Due Process*

■■■■ Plaintiffs argue that the must-carry provisions of § 338 violate the Due Process Clause of the Fifth Amendment. However, the statute provides no factual basis for Plaintiffs' allegations. Plaintiffs must demonstrate three elements to plead a cognizable due process claim: (1) that the claimant possesses an interest in property, (2) that state action deprives the claimant of the property interest, and (3) that the state's action falls "so far beyond the outer limits of legitimate government action that no process could cure the deficiency." *Front Royal*, 135 F.3d at 288. Plaintiffs cannot state a claim for relief for violation of due process because they cannot demonstrate the second and third elements. As detailed above, the SHVIA must-carry provisions do not deprive satellite carriers of their property interest.

*See infra* section III.F.1. Section 338 is voluntary and has the potential of expanding, not reducing, carriers' property interest. Through the SHVIA license and must-carry provisions, satellite carriers have the opportunity to broadcast a wide range of local television stations which otherwise they could not broadcast without paying royalties to individual copyright owners. *See* 17 U.S.C. § 122(a), (c); 47 U.S.C. § 338(a). Furthermore, Congress' action in promulgating § 338 does not exceed the limits of legitimate government action because Congress had substantial and important purposes in promulgating the must-carry provisions. *See infra* section III.D.1 (setting forth the interests that form the basis for SHVIA and citing H.R. REP. No. 106–464 at 91–92, 101); III. D.2 (indicating that the Supreme Court found the same interests that form the basis of SHVIA to be important when they formed the basis of the cable must-carry provisions). As discussed in detail above, those Congressional goals are within the limits of legitimate government action. *See, e.g., Turner I,* 512 U.S. at 664, 114 S.Ct. 2445; *Turner II,* 520 U.S. at 189–90, 117 S.Ct. 1174. Therefore, the must-carry regulations do not violate the Due Process Clause of the Fifth Amendment.

## V. CONCLUSION

Thus, for the reasons stated above, the Court finds that the Satellite Home Viewer Improvement Act of 1999 is constitutional and dismisses Plaintiffs' Complaint. SHVIA does not violate the First Amendment because it does not regulate impermissibly satellite carriers' speech, and it promotes free television and the wide dissemination of programming. Furthermore, there is no First Amendment violation because Congress has the authority to grant a copyright license to retransmit

local television programs. In addition, SHVIA does not effect a Fifth Amendment "taking" because (1) SHVIA has the potential to expand the value of satellite carriers' property; (2) exposure to the must-carry obligations is voluntary; and (3) satellite carriers retain control over their property by deciding whether to accept a copyright license to retransmit local television stations and thereby incur the must-carry obligations in local markets. Finally, the must-carry regulations do not violate due process because Congress has acted within its authority in granting a copyright license with accompanying must-carry provisions, and the must-carry provisions do not strip the satellite carriers' property of its value.

Accordingly, for the reasons stated above, Defendants' motions to dismiss are GRANTED.

The Clerk is directed to forward a copy of this Memorandum Opinion to counsel of record.

## ORDER

THIS MATTER is before the Court on the Motion to Dismiss filed by Defendants the Federal Communications Commission ("FCC"), the FCC's Chairman (William E. Kennard), the FCC's Commissioners (Susan Ness, Harold Furchtgott–Roth, Michael K. Powell, and Gloria Tristani), the United States Copyright Office of the Library of Congress, the Librarian of the Library of Congress (James H. Billington), and the Registrar of Copyrights (Marybeth Peters),[1] and on the Motion to Dismiss filed by Intervenor–Defendants the Association of America's Public Television Stations, the Public Broadcasting Service, and the Corporation for Public Broadcasting.

---

1. The individual Defendants are parties to this suit in their official capacities.

This case involves satellite carriers' facial challenge to the constitutionality of the copyright license created by the Satellite Home Viewer Improvement Act of 1999 and the license's "must carry" provisions under the First and Fifth Amendments to the Constitution. In essence, the satellite carriers assert that the "must carry" provisions of the new copyright license infringe upon carriers' First Amendment right to control program content and effect a "taking" of property in violation of the Fifth Amendment because the carriers are required to carry certain stations in a given market if the carriers want to take advantage of the copyright license in that market.

The specific issues before the Court are whether Plaintiffs have pled a cause of action that (1) the Satellite Home Viewer Improvement Act of 1999 ("SHVIA" or "Act"), on its face, violates satellite carriers' First Amendment rights; (2) Congress has exceeded its authority in promulgating SHVIA; (3) SHVIA effects a taking of satellite carriers' private property without just compensation in violation of the Fifth Amendment Takings Clause; and (4) SHVIA deprives satellite carriers of their property without due process in violation of the Fifth Amendment Due Process Clause.

For the reasons set forth in the accompanying Memorandum Opinion, the Court holds that the SHVIA is constitutional and does not in any way violate the First and Fifth Amendment rights of satellite carriers. Moreover, the Act is a proper exercise of Congress' plenary powers over copyright and Congress' power to promote the free and full exchange of information over the broadcast spectrum. In considering the satellite carriers' First Amendment claims, the Court holds first that SHVIA is subject to review using intermediate scrutiny. Next, the Court finds that the must-carry provisions do not violate Plaintiffs' First Amendment rights because (1) neither the provisions' language nor their purpose are content-based; (2) the provisions are within the authority granted to the Government under the Copyright Clause; (3) the must-carry provisions further important governmental interests that are unrelated to the suppression of free expression; and (4) any incidental restriction on satellite carriers' First Amendment freedoms is no greater than necessary to further the Government's interests. With respect to the satellite carriers' Fifth Amendment claims, the Court holds that SHVIA does not effect a taking of satellite carriers' property because the carriers may choose to accept or decline a free copyright license to retransmit the local programs of any given market. Satellite carriers decide whether to incur the must-carry obligations because the obligations travel with the optional copyright license into various markets. Moreover, SHVIA's copyright license has the potential to expand the value of satellite carriers' property. Finally, the Court holds that the must-carry regulations do not violate due process because Congress has acted within its authority in promulgating the must-carry provisions, and the regulations do not strip satellite carriers' property of all of its value.

For these reasons, the Court does not sustain the satellite carriers' constitutional objections to SHVIA. Accordingly, it is hereby

ORDERED that Defendants' motions to dismiss are GRANTED.

The Clerk is directed to forward a copy of this Order to counsel of record.